UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ERWIN SINGH BRAICH,

              Plaintiff,

   v.

STEVE MITTELSTAEDT, et al.,

              Defendants.

CASE NO. C07-0177-JCC

ORDER

      This matter comes before the Court on KPMG Defendants' Motion to Dismiss (Dkt. No. 13), and McLean Defendants' Motion to Dismiss (Dkt. No. 16).  Having considered the memoranda, exhibits, and declarations submitted for and against these motions, and having determined that an evidentiary hearing is not necessary, the Court hereby finds and rules as follows.

I.    **BACKGROUND**

      Plaintiff Erwin Singh Braich is a Canadian citizen, and describes himself as a "well respected and internationally known industrialist and philanthropist." (Dkt. No. 1 at 8.)  Since 1999, Plaintiff has been in involuntary bankruptcy proceedings in Canada.  (Dkt. Nos. 13 at 3; 13-5 at 2.)  On October 1, 1999, the Honorable Justice Lowry of the Supreme Court of British Columbia appointed KPMG Inc., a Canadian corporation, as trustee in Plaintiff's bankruptcy proceedings.[1]  (*Id.*)  KPMG retained Brian G.

---

[1] Defendant KMPG LLP owns KPMG Inc.  Defendants Robert Rusko and David Wood are current or former employees of KPMG Inc.  (*Id.*)  The Court will consider this set of Defendants

ORDER – 1

1   McLean, and his law firm of McLean & Armstrong, to assist it with carrying out its duties as trustee.[2]

2   (Dkt. No. 16 at 2.)

3        KPMG argues in the present motion that Plaintiff refused to cooperate with the bankruptcy

4   proceedings.  (Dkt. Nos. 13 at 3-4; 13-5.)  Plaintiff contests this characterization.  (Dkt. Nos. 22 at 2; 22-

5   5; 22-7; 22-8; 22-9; 22-15.)  The Court finds it unnecessary to resolve the factual disputes as to Plaintiff's

6   conduct during the bankruptcy proceedings at this time.  Plaintiff remains an undischarged bankrupt.

7        Plaintiff filed a complaint in this Court to challenge an allegedly unconstitutional search of a hotel

8   room in Bellingham, Washington that he was sporadically inhabiting between 2002 and 2004, and the

9   seizure of personal property from that hotel room.  (Dkt. No. 1 at 17-30.)  Plaintiff alleges the challenged

10  search and seizure arises out of a widespread conspiracy, or as Plaintiff states:

11       This Complaint arises out of an agreement among the Defendants to discredit, punish and
         seek revenge against the Plaintiff and that included, among other things, the abuse of the

12       Canadian bankruptcy laws to fraudulently petition Plaintiff into bankruptcy; the abuse of
         the Canadian bankruptcy and criminal laws for the purpose of falsely obtaining civil and

13       criminal arrest warrants against the Plaintiff, and causing Plaintiff to be unable to return to
         the country of his birth unhindered by the threat of an indefinite length of imprisonment;

14       and the methodical orchestration, planning, and execution of unlawful searches of
         Plaintiff's Property, and seizure, and detention of the Plaintiff's Property in the State of

15       Washington.

16  (Id. at 1.)  Plaintiff alleges that Defendants are liable under 42 U.S.C. §§ 1983, 1985, the Alien Tort

17  Claims Act, 28 U.S.C. § 1350, 18 U.S.C. § 242, and for various state torts.  He seeks approximately

18  $500,000,000, and other relief.  (Id. at 5-7.)

19       KPMG and McLean argue that Plaintiff's action should be dismissed because of a provision of the

20  Canadian Bankruptcy and Insolvency Act, which requires a bankrupt to obtain leave from a Canadian

21  court to sue a bankruptcy trustee.  Section 215 provides, "Except by leave of the court, no action lies

22  against the Superintendent, an official receiver, and interim receiver or a trustee with respect to any

23  _____

24  together, as "KPMG Defendants" or "KPMG."

25     [2] The Court will refer to Mr. McLean and the law firm of McLean & Armstrong collectively as
    "McLean Defendants" or "McLean."

26  ORDER – 2

report made under, or any action taken pursuant to, this Act." Canada Bankruptcy and Insolvency Act, R.S.C., ch. B-3, s. 215 (1985) ("section 215"). KPMG and McLean argue that obtaining leave from the Canadian bankruptcy court under section 215 is a jurisdictional prerequisite to the present suit. Since Plaintiff did not obtain permission from the Canadian bankruptcy court to file the present suit, Defendants argue that Plaintiff's claims against KPMG and McLean should be dismissed, or at least stayed, until Plaintiff obtains leave to sue from the Canadian court. Relatedly, KPMG and McLean assert that the Court should adhere to section 215 and abstain from hearing the suit as a matter of international comity. McLean argues that section 215 of the BIA extends to lawyers and other professionals employed by a trustee to assist the trustee in performing its duties.[3]

On May 11, 2007, KPMG filed a motion in the Plaintiff's bankruptcy proceeding, pending before the Supreme Court of British Columbia in Bankruptcy. (Dkt. No. 25 at 2.) In that motion, KPMG sought a declaration that Plaintiff is required to obtain leave under section 215 before suing them and an injunction enjoining Plaintiff from prosecuting them in the present action, or any other action, without obtaining such leave. (*Id.*) A hearing is scheduled on that motion for October 1, 2007. The McLean Defendants have not notified the Court of any attempt on their part to seek the guidance of the Canadian court.

## II.    STANDARD

Both KPMG and McLean style their motions to dismiss as, at least in part, challenging this Court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). (Dkt. Nos. 13 at 5, 16 at 2.) Consideration of matters outside the pleadings will convert a Rule 12(b)(6) motion into one for summary judgment under Rule 56. Fed. R. Civ. P. 12 ("If, on a [Rule 12(b)(6) motion], matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for

---

[3] The McLean Defendants also argue that they are immune from suit under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604, and that Plaintiff fails to state a claim on which relief can be granted. (Dkt. No. 16.)

ORDER – 3

1  summary judgment and disposed of as provided in Rule 56."). When considering a factual attack on

2  subject matter jurisdiction in a Rule 12(b)(1) motion, on the other hand, "the trial court may proceed as it

3  never could under 12(b)(6) or Fed. R. Civ. P. 56." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d

4  884, 891 (3d Cir. 1977). In such cases, the court "is not restricted to the face of the pleadings, but may

5  review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence

6  of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). Moreover, "[n]o

7  presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts

8  will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover,

9  the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Thornhill Pub. Co. v. Gen.*

10  *Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979) (quoting *Mortensen*, 549 F.2d at 891).

11        Plaintiff interprets KPMG as making a factual attack on the existence of jurisdiction, and requests

12  an evidentiary hearing to resolve disputed factual issues. (Dkt. No. 22 at 5.) Plaintiff does not specify,

13  however, what issues of fact need to be resolved to enable the Court to ascertain whether it has

14  jurisdiction. The Court does not, at this time, discern a need for an evidentiary hearing to address factual

15  issues relating to jurisdiction.

16        On at least one occasion, the Supreme Court has declined to decide whether refusing to hear a

17  case on the basis of international comity deprives a court of jurisdiction in the first instance. *Hartford*

18  *Fire Ins. Co. v. California*, 509 U.S. 764, 798 (1993) ("[E]ven assuming that in a proper case a court

19  may decline to exercise Sherman Act jurisdiction over foreign conduct (or, as Justice Scalia would put it,

20  may conclude by the employment of comity analysis in the first instances that there is no jurisdiction),

21  international comity would not counsel against exercising jurisdiction in the circumstances alleged

22  here."). The Court does not reach a final resolution on the question of whether, as a matter of comity, it

23  should defer to the Canadian tribunal, or apply Canadian law to bar the action against KPMG and

24  McLean until Plaintiff has obtained leave to sue. At this time, then, it is sufficient to note that the

25  appropriate Rule 12(b) standard to apply on a motion to dismiss on the basis of comity is not

26  ORDER – 4

1    straightforward, and will depend on the Court's ultimate determination as to whether the comity decision

2    and the merits of Plaintiff's claim are "so intermeshed that the question of jurisdiction is dependent on

3    decision of the merits." *Thornhill*, 594 F.2d at 735; *see also Timberlane Lumber Co. v. Bank of Am.*

4    *Nat'l Trust and Savings Ass'n*, 749 F.2d 1378, 1381 (9th Cir. 1984) (parsing out the appropriate 12(b)

5    standard to use in a case involving questions of whether American law should be applied extraterritorially

6    and whether deference under the doctrine of comity was merited).

7    **III.   ANALYSIS**

8         **A.     Subject Matter Jurisdiction**

9         KPMG and McLean argue that this suit should be dismissed, because compliance with section 215

10    is a prerequisite for the Court's subject matter jurisdiction. (Dkt. No. 13 at 6.)  In support of this

11    contention, Defendants cite *McNeil v. United States*, 508 U.S. 106 (1993), *Sw. Ctr. for Biological*

12    *Diversity v. United States Bureau of Reclamation*, 143 F.3d 515 (9th Cir. 1998), *Wash. Trout v. McCain*

13    *Foods, Inc.*, 45 F.3d 1351 (9th Cir. 1995), and *Caton v. United States*, 495 F.2d 635 (9th Cir. 1974).

14         The Court is not persuaded that compliance with section 215 is a prerequisite to this Court's

15    jurisdiction.  Under Article III of the United States Constitution and federal statute, federal district courts

16    have subject matter jurisdiction over cases arising under federal statutes, treaties or the United States

17    Constitution.  U.S. Const., Art. III, cl. 2 ("The judicial Power shall extend to all Cases, in Law and

18    Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall

19    be made, under their Authority."); 28 U.S.C. § 1331.  Moreover, this action is brought pursuant to 42

20    U.S.C. §§ 1983 and 1985.  These statutes have a specific "jurisdictional counterpart."  *Golden State*

21    *Transit Corp. v. Los Angeles*, 493 U.S. 103, 108 n.4 (1989).  28 U.S.C. § 1343(a).  A federal district

22    court properly has federal question jurisdiction over an action filed under §§ 1983 and 1985.

23         In creating a federal cause of action, however, it is not uncommon for Congress to impose certain

24    preconditions or prerequisites to filing suit, which sometimes become known as "jurisdictional"

25    requirements.  For instance, the Endangered Species Act has a "citizen suit" provision which confers a

26    ORDER – 5

1   private right of action to enjoin alleged violations of the ESA.  16 U.S.C. § 1540(g).  However, the same

2   statute as creates the cause of action provides that "[n]o action may be commenced" prior to sixty days

3   after written notice of the alleged violation is given to the relevant governmental agency.  16 U.S.C. §

4   1540(g)(2)(A)(i).  This sixty-day notice requirement has been held to be "jurisdictional," in the sense that

5   failure to comply with the requirement is an unwaivable bar to bringing a citizen suit under the ESA.  *Sw.*

6   *Ctr. for Biological Diversity*, 143 F.3d at 520.  The citizen suit provision of the Clean Water Act, 33

7   U.S.C. § 1365, also has a governmental notice requirement that has been held to be jurisdictional.  *Wash.*

8   *Trout*, 45 F.3d at 1354; *see also Hallstrom v. Tillamook County*, 493 U.S. 20, 26 (1989) (holding that

9   "under a literal reading of the [Resource Conservation and Recovery Act], compliance with the 60-day

10  notice provision is a mandatory, not optional, condition precedent for suit").  Similarly, failure to comply

11  with the statutory requirement that a plaintiff exhaust a claim administratively before bringing a cause of

12  action under the Federal Tort Claims Act divests a federal court of jurisdiction to hear such a claim.

13  *Caton*, 495 F.2d at 638.

14       These cases have little relationship to the matter at issue here, however.  In the cases relied upon

15  by KPMG and McLean, the United States Congress imposed a statutory requirement on prospective

16  plaintiffs when it created the relevant cause of action.  The decisions holding such requirements to be

17  jurisdictional were based on "the plain language," *Wash. Trout*, 45 F.3d at 1354, or "the most natural

18  reading," *McNeil*, 508 U.S. at 112, or "a literal reading," *Hallstrom*, 493 U.S. at 26, of the statute that

19  imposed the limit.  Section 215 is distinguishable from the limiting statutory provisions in this line of

20  cases in two important respects.  First, the statute that KPMG argues limits the jurisdiction of the courts

21  of the United States is not itself a product of the United States Congress.  Accordingly, section 215 does

22  not indicate a Congressional intent to limit the jurisdiction of American courts.  Second, even if section

23  215 were a provision of the United States Bankruptcy Code, instead of the Canadian bankruptcy code,

24  Congressional intent to limit the cause of action would not be as clear as it is in the line of cases upon

25  which Defendants rely.  Interpreting a bankruptcy statute to impose a jurisdictional limit on a civil rights

26

ORDER – 6

1    cause of action would not be quite so analytically seamless as interpreting the governmental notice

2    requirement to impose a jurisdictional limitation on the cause of action created in the same section of the

3    Endangered Species Act.  *Sw. Ctr. for Biological Diversity*, 143 F.3d at 520.

4          In the present case, Defendants fail to present any alternative authority by which to discern a

5    Congressional intent to limit the jurisdiction of United States courts to hear civil rights actions filed by

6    bankrupts that have not been cleared by the Canadian court overseeing the bankruptcy.  The Court

7    doubts that this was due to failure to adequately research the issue; it simply cannot be concluded that

8    Congress intended to set up compliance with a foreign bankruptcy law as a jurisdictional prerequisite for

9    prospective plaintiffs under American civil rights statutes.  Absent any indication that this was Congress's

10   intent, the Court declines to interpret Plaintiff's failure to comply with section 215 as divesting it of

11   subject matter jurisdiction.

12          **B.    Section 215's Extraterritorial Application**

13          Determining that section 215 is not a jurisdictional prerequisite to the present suit does not end

14   the Court's analysis, however.  This Court could still apply section 215 and dismiss the present suit as a

15   discretionary matter.  Whether the Court will employ section 215 as a matter of discretion depends on the

16   presence of two preconditions that are commonly analyzed as "jurisdictional."  First, section 215 must be

17   determined to have extraterritorial reach, as a matter of Canadian substantive law.  *Hartford Fire Ins.*

18   *Co.*, 509 U.S. at 813 (Scalia, J., dissenting).  This is a jurisdictional question insofar as it implicates

19   "legislative jurisdiction," otherwise known as "jurisdiction to prescribe."  *Id.*  The parties do not parse out

20   this question, but the Court finds that its resolution is a necessary precursor to determining whether this

21   provision of Canadian law can, and should, bar this action brought pursuant to the protections of

22   American law.  The second precondition to dismissal is that this tribunal must decide to defer to the

23   Canadian court's desire to apply section 215 extraterritorially, on the basis of international comity.

24          Questions of whether and when an American law applies extraterritorially have engendered a

25   great deal of analysis among courts in this country.  *See, e.g.*, *Timberlane Lumber Co. v. Bank of Am.*,

26   ORDER – 7

1    549 F.2d 597, 608-15 (9th Cir. 1976) (analyzing whether the Sherman Act should be applied

2    extraterritorially), *on remand at*, 574 F. Supp. 1453 (N.D. Cal. 1983), *affirmed by*, 749 F.2d 1378 (9th

3    Cir. 1984).  *But see Lauritzen v. Larsen*, 345 U.S. 571, 576 (1953) (applying Danish law to a dispute in

4    American court without examining whether the foreign law was intended to be applied extraterritorially,

5    stating, "Respondent does not deny that Danish law is applicable to his case").  It has long been a canon

6    of construction under American law that "'legislation of Congress, unless a contrary intent appears, is

7    meant to apply only within the territorial jurisdiction of the United States.'"  *EEOC v. Arabian Am. Oil

8    Co.*, 499 U.S. 244, 248 (1991) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)).  There

9    have, of course, been instances in which American courts have determined that the presumption against

10   extraterritorial application has been overcome, as is the case with American antitrust laws.  *Matsushita

11   Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 n.6 (1986).

12          The *Third Restatement of Foreign Relations Law* provides several bases aside from territoriality

13   for "jurisdiction to prescribe," including nationality, the effects principle, and the protective principle.[4]

14   The present circumstances provide several possible justifications for the extraterritorial application of

15   section 215.  Obviously, nationality provides a justification, since the Plaintiff and several of the

16   Defendants are Canadian nationals.  Moreover, the conduct regulated by section 215—the filing of a

17   lawsuit by a bankrupt against a bankruptcy trustee—may be intended to have an effect on the Canadian

18   bankruptcy proceedings that are ongoing.  The effects principle, then, could provide an additional or

19

20          [4] The Restatement provides:

21          [A] state has jurisdiction to prescribe law with respect to (1)(a) conduct that, wholly or in
            substantial part, takes place within its territory; (b) the status of persons, or interests in
22          things, present within its territory; (c) conduct outside its territory that has or is intended
            to have substantial effect within its territory; (2) the activities, interests, status, or relations
23          of its nationals outside as well as within its territory; and (3) certain conduct outside its
            territory by persons not its nationals that is directed against the security of the state or
24          against a limited class of other state interests.

25   *Restatement (Third) of Foreign Relations Law* § 402 (1987).

26   ORDER – 8

1    supplemental justification for the extraterritorial application of section 215.[5]  It should be noted, of

2    course, that the Restatements are purportedly statements of *American* law, and whether the

3    Restatement's elucidation of the principles surrounding jurisdiction to prescribe is an accurate statement

4    of American law is not free from doubt.  *See* Janis, Mark W., *An Introduction to International Law* 337

5    (4th ed. 2003).

6           In the end, however, this Court can only speculate as to whether section 215 is intended to apply

7    extraterritorially.  This is a question of Canadian law.  Though Plaintiff and KPMG have provided

8    Declarations from respective experts in Canadian law (Dkt. Nos. 13-2, 22-22), the experts do not take up

9    the question of whether, and when, section 215 is intended to have extraterritorial application under

10   Canadian law.  Fortunately, however, KPMG has already set in motion a proceeding by which this Court

11   may benefit from the superior expertise of the Canadian bankruptcy court on this matter.  In deciding

12   whether KPMG is entitled to a declaration that section 215 requires Plaintiff to obtain leave of the

13   Supreme Court of British Columbia before suing KPMG in the United States, the Canadian court will

14   have to determine whether section 215 is intended to apply beyond Canadian borders, and if so, whether

15   the present case is an appropriate case in which to apply it.

16          The Court hereby rules that the question of whether section 215 merits dismissal of KPMG and

17   McLean depends on a determination, properly made by a Canadian court, that section 215 is intended to

18   apply extraterritorially.  Accordingly, the Court GRANTS the request of KPMG and McLean that the

19   Court stay this action pending the resolution of KPMG's motion before the Canadian bankruptcy court.

20          **C.    Section 215's Application to McLean Defendants**

21          The above analysis concerning the extraterritorial application of the Canadian law applies equally

22   to McLean Defendants.  McLean Defendants have an additional hurdle, however.  Section 215 by its

23

24          [5] The comments to the Restatement indicate that a combination of justifications may make the
     exercise of jurisdiction to prescribe reasonable.  "An exercise of jurisdiction on the basis of effect in the
25   territory . . . may be more acceptable with respect to nationals of the state exercising jurisdiction than
     with respect to nonresident aliens."  *Restatement (Third) of Foreign Relations Law* § 402 cmt. b (1987).

26   ORDER – 9

1    terms applies only to the "Superintendent, an official receiver, and interim receiver or a trustee."  McLean

2    Defendants argue that this Court should interpret section 215 to extend to "lawyers and other

3    professionals employed by a trustee to assist the trustee in performing its duties." (Dkt. No. 16 at 16.)

4          Having already concluded that this action will benefit from the Canadian court's resolution of the

5    motion filed by KPMG, it is not necessary to reach the question of whether section 215 should be

6    interpreted to extend to professionals employed by the trustee.  However, since this is another question of

7    substantive Canadian law concerning the scope of section 215, the Court will be interested in whether the

8    forum that is better equipped to determine this question, the Canadian court, provides any guidance on

9    whether section 215 reaches the lawyers of bankruptcy trustees.

10         **D.    International Comity**

11         Should the Canadian court determine that section 215 is indeed intended to apply extraterritorially

12   in situations such as that before the Court here, this Court will then have properly before it the second,

13   and related, "jurisdictional" question of whether this Court *should* decline to exercise jurisdiction over

14   this suit as a matter of international comity.  Comity, in the broadest sense, is "[t]he extent to which the

15   law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by

16   judicial decree, shall be allowed to operate within the dominion of another nation." *Hilton v. Guyot*, 159

17   U.S. 113, 163 (1895).

18          "Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand,
           nor of mere courtesy and good will, upon the other.  But it is the recognition which one
19         nation allows within its territory to the legislative, executive or judicial acts of another
           nation, having due regard both to international duty and convenience, and to the rights of
20         its own citizens or of other persons who are under the protection of its laws.

21   *Id.*  The term "comity" is used to apply to a range of situations.  It can refer to the "comity of courts,

22   whereby judges decline to exercise jurisdiction over matters more appropriately adjudged elsewhere," or

23   to "'prescriptive comity': the respect sovereign nations afford each other by limiting the reach of their

24   laws." *Hartford*, 509 U.S. at 817 (Scalia, J., dissenting).  The present case involves a type of prescriptive

25   comity—out of respect for Canadian law and proceedings, KPMG and McLean ask the Court to give

26   ORDER – 10

1    effect to section 215.

2         The reconciliation of two nations' laws in a dispute that transcends national borders is not an easy

3    task and, as is the case when reconciling the law of the United States with international law, an approach

4    grounded on harmonization of the two sets of laws is preferable.  *See, e.g.*, *Murray v. The Schooner*

5    *Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804) ("[A]n act of congress ought never to be construed to

6    violate the law of nations if any other possible construction remains.").  Accordingly, comity questions

7    are typically resolved by examining the respective interests of the two nations in the application of their

8    laws.  In a case concerning whether Danish law should apply in a Jones Act action filed by a Danish

9    seaman in a United States court, the Supreme Court endorsed an approach based in the type of interest

10   analysis that is found in modern choice of law discussions.

11        Maritime law, like our municipal law, has attempted to *avoid or resolve conflicts* between
          competing laws by ascertaining and valuing points of contact between the transaction and
12        the states or governments whose competing laws are involved.

13   *Lauritzen v. Larsen*, 345 U.S. 571, 582 (1953) (emphasis added).  Similarly, in *Hartford Fire Insurance*

14   *Co. v. California*, 509 U.S. 764, 798 (1993), the Court concluded that the determination that there was

15   no "true conflict" between domestic and foreign law rendered moot the question of whether it should

16   abstain for comity reasons.  *Id.* (citing *Societe Nationale Industrielle Aerospatiale v. United States Dist.*

17   *Court for the Southern Dist. of Iowa*, 482 U.S. 522, 555 (Blackmun, J., concurring in part and dissenting

18   in part) ("As in the choice-of-law analysis, which from the very beginning has been linked to international

19   comity, the threshold question in a comity analysis is whether there is in fact a true conflict between

20   domestic and foreign law.")).[6]

21   ─────────────

22        [6] Courts, including the Ninth Circuit, have also employed this type of interest analysis in
     determining whether American law should be applied extraterritorially.  For instance, in *Timberlane*

23   *Lumber Company v. Bank of America*, the Ninth Circuit determined that the extraterritorial application of
     the Sherman Act required analysis of "whether the interests of, and links to, the United States . . . are

24   sufficiently strong, vis-a-vis those of other nations, to justify an assertion of extraterritorial authority."
     549 F.2d at 613.  The elements that the *Timberlane* Court cited as relevant to the consideration of

25   whether American law should apply were: "the degree of conflict with foreign law or policy, the
     nationality or allegiance of the parties and the locations or principal places of business or corporations,

26   ORDER – 11

1    Staying this action while KPMG seeks guidance from the Canadian court as to whether section

2  215 applies here permits this Court to defer to the Canadian tribunal, and the interests at stake behind

3  section 215, without any cost to American interests.  KPMG has already sought resolution of this

4  question in the Canadian court, and Plaintiff will not be prejudiced by a brief delay.  At present, then,

5  granting a stay presents, in jurisdictional terms, a "false conflict."  *See, e.g.*, Phillips *Petroleum Co. v.*

6  *Shutts*, 472 U.S. 797, 839 n.20 (1985) (Stevens, J., concurring).

7    Should the Canadian court determine that section 215 is intended to apply extraterritorially, and

8  would require Plaintiff to seek leave before suing KPMG, McLean, or both, this Court will have to face

9  the more difficult question of whether dismissing KPMG and/or McLean creates a conflict between

10  Canadian and American law.  However, being able to utilize the perspective of the Canadian bankruptcy

11  court—which has the benefit of having seen the full course of the bankruptcy proceedings, as well as the

12  increased familiarity with the lawfulness or unlawfulness of the conduct alleged in the present suit under

13  Canadian bankruptcy law—can only be of assistance to this Court in making that determination.  The

14  Court postpones this more difficult question, then, to a future day.[7]

15

_____

16  the relative significance of effects on the United States as compared with those elsewhere, the extent to

17  which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect,
    and the relative importance to the violations charged of conduct within the United States as compared

18  with conduct abroad."  *Id.* at 614.

19    [7] Should the Canadian court determine that section 215 is intended to apply to this action, it will
    be difficult for Plaintiff to persuade the Court that it should not defer to the Canadian law.  While the case

20  is not completely ananlogous, the Court is largely persuaded by the reasoning in *In re Petition of Davis*,
    191 B.R. 577 (Bankr. S.D.N.Y. 1996).  Application of section 215 would not operate to bar Plaintiff's

21  action completely against KPMG, and possibly McLean; Plaintiff would simply have to seek leave to
    proceed with the action.  The standard for granting leave does not appear to be terribly high—the law is

22  designed to prevent bankruptcy trustees from being harassed by frivolous and baseless lawsuits.  *Mancini*
    *(Bankrupt) v. Falconi*, [1993] 61 O.A.C. 332, 333.  It is difficult to imagine an American interest that

23  might be advanced in favor of a frivolous lawsuit.  Finally, because of its familiarity with the course of the
    bankruptcy proceedings, the Canadian court is better equipped than this one to make the determination

24  set out in section 215.  While reserving final judgment on this question to a future order, the Court at
    present has some difficulty discerning a conflict between section 215 and an American interest that would

25  complicate the question of whether to respect the Canadian law as a matter of comity.

26  ORDER – 12

IV.   **CONCLUSION**

The Motions to Dismiss of KPMG and McLean (Dkt. Nos. 13 and 16) are GRANTED IN PART and DENIED IN PART.  The Court hereby orders this case stayed as to all Defendants, pending the outcome of KPMG's motion before the Canadian bankruptcy court as to the application of section 215 to these proceedings.  KPMG is ordered to supply the Court with a copy of any written order issued by the Court, or if one is not available, a transcript of the Court's oral order.  Should McLean Defendants obtain a ruling of relevance to the issue discussed in Part III.C of this order, they are ordered to supply the Court with such.

The Motions to Dismiss request other relief not granted in this order; specifically, KPMG and McLean request dismissal on the basis of comity, and McLean argues immunity under the Foreign Sovereign Immunities Act and requests dismissal for failure to state a claim on which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Court hereby denies those requests for relief without prejudice.  Once the Canadian bankruptcy court has ruled on the motion brought by KPMG, Defendants can incorporate that ruling and renew their requests for relief should they choose to do so.

SO ORDERED this 7th day of August, 2007.


John C. Coughenour
United States District Judge

ORDER – 13