1

HON. BENJAMIN H. SETTLE

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

9

10

ERWIN SINGH BRAICH,

No. 2:07-cv-00177-BHS

11

Plaintiff,

12

v.

DECLARATION OF JONATHAN
TWEEDALE IN SUPPORT OF THE
KPMG DEFENDANTS' RENEWED
MOTION TO DISMISS

13

STEVE MITTELSTAEDT; KEITH M.
OLSON; THE CITY OF
BELLINGHAM; TYLER LETEY;
SHREE SHARMA; THE STATE OF
WASHINGTON; BRIAN G. McLEAN;
McLEAN & ARMSTRONG; ROBERT
RUSKO; DAVID WOOD; KPMG, INC.;
KPMG LLP; RCMP SARGEANT TIM
ALDER; THE GOVERNMENT OF
CANADA; and JOHN/JANE DOES 1-
10,

NOTE ON MOTION CALENDAR:
**January 9, 2008**

14

15

16

17

18

19

Defendants.

20

21

I, Jonathan Tweedale, declare as follows.

22

1.      I am an attorney at the law firm Gudmundseth Mickelson LLP and have

23

been assisting in the representation of KPMG Inc., KPMG LLP, Robert Rusko and David

24

Wood (the "KPMG Defendants") in connection with the KPMG Defendants' application

25

under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 for a declaration that Erwin

26

Singh Braich is required to obtain leave from the Supreme Court of British Columbia in

DECLARATION OF JONATHAN TWEEDALE
IN SUPPORT OF THE KPMG DEFENDANTS'
RENEWED MOTION TO DISMISS
NO. 2:07-cv-00177-BHS – Page 1

YARMUTH WILSDON CALFO PLLC

FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1    Bankruptcy before bringing proceedings against the KPMG Defendants (the

2    "Application").  I am over the age of 18 and am competent to testify to the information

3    contained herein.

4         2.      The decision of Chief Justice Brenner, in respect of the Application, was

5    rendered on November 7, 2007.

6         3.      Under the *General Rules under the Bankruptcy and Insolvency Act*, a

7    prospective appellant has 10 days to file an appeal or an application for leave to appeal.  As

8    a result of counsel's oversight, that deadline was missed, and Mr. Braich's appeal of

9    Brenner C.J.'s decision was filed in the time normally required under section 14 of the

10   *Court of Appeal Act*, R.S.B.C. 1996, c. 77.

11        4.      Mr. Braich then brought an application in the British Columbia Court of

12   Appeal (in chambers) seeking an extension of time to cure the missed filing deadline.  That

13   application was granted by Tysoe J.A. on December 17, 2007.  Tysoe J.A. both granted the

14   extension of time and concluded that the nature of the appeal was such that Mr. Braich was

15   not required to apply for or obtain leave to appeal.  Mr. Braich's notice of appeal was then

16   filed on December 18, 2007.

17        5.      In the case of an appeal as of right, the following is the timetable as

18   prescribed by the *Court of Appeal Rules*:

19              i) Within 60 days of filing the notice of appeal, the appellant must file copies

20   of an appeal record;

21              ii) Within 30 days of filing the appeal record, the appellant must file its

22   factum;

23              iii) Within 30 days after being served with the appellant's factum, the

24   respondent must file its factum; and

25              iv) If the appellant wishes to reply to the respondent's factum, they must file

26   that reply within 7 days after being served with the respondent's factum.

DECLARATION OF JONATHAN TWEEDALE
IN SUPPORT OF THE KPMG DEFENDANTS'
RENEWED MOTION TO DISMISS
NO. 2:07-cv-00177-BHS – Page 2

6.      In the usual course, it is only after the appellant's and response facta have been filed that a hearing date is obtained from the Court of Appeal Registry (although a date may be secured after only the Appellant's Factum has been filed).  I have spoken with Maria Littlejohn, Deputy Registrar of the Court of Appeal, who confirms my estimate that a 1 day appeal date would be available approximately 2 months after such facta have been filed.  Ms. Littlejohn also confirms that given that the Court of Appeal will not hold hearings from June 20, 2008 until September 2, 2008, it is possible that this matter will not be heard until after the summer.

7.      After the hearing of an appeal, it is not uncommon for the Court of Appeal to reserve judgment, and then to take several weeks or months to render its decision.

8.      A decision of the Court of Appeal may, in certain circumstances, be appealed to the Supreme Court of Canada.  In this case, such an appeal would first require a leave application.  The following is the timetable as prescribed by the *Supreme Court Act*, R.S., 1985, c. S-26 and the *Rules of the Supreme Court of Canada*:

i)  The applicant's notice of application for leave to appeal must be served and filed within 60 days after the date of the judgment appealed from;

ii)  The respondent's response must be filed and served within 30 days after the service of the application for leave to appeal; and

iii)  The applicant may file a reply within 10 days after service of the respondent's response.

9.      According to the Supreme Court of Canada's website (www.scc-csc.gc.ca/faq/faq/index_e.asp#f19), decisions on leave applications are rendered, on average, 6 months after the leave application is filed.  In the event that leave is granted, the following is the applicable timetable:

i)  The appellant must file its notice of appeal within 30 days of the decision of the Court granting leave;

DECLARATION OF JONATHAN TWEEDALE
IN SUPPORT OF THE KPMG DEFENDANTS'
RENEWED MOTION TO DISMISS
NO. 2:07-cv-00177-BHS – Page 3

YARMUTH WILSDON CALFO PLLC

FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1           ii) the appellant must file its factum within 12 weeks after the filing of the

2   notice of appeal; and

3           iii) the respondent must file its factum within 8 weeks after service of the

4   appellant's factum.

5        10.    According to the Supreme Court of Canada website (www.scc-

6   csc.gc.ca/faq/faq/index_e.asp#f19), judgments on appeals are rendered on average 6 months

7   after the hearing of the appeal.

8        11.    Attached to this declaration as Exhibit A is a true and correct copy of *Meier*

9   *v. Canada (Minister of Justice)*, [1983] FCJ No. 425 (TD).  Attached to this declaration as

10  Exhibit B is a true and correct copy of *Harrison v. Harrison*, [2007] BCJ No. 350 (CA).

11  

12       I declare under penalty of perjury under the laws of the Canada that the foregoing is

13  true and correct.

14  

15       Executed this 9th day of January, 2008, in Vancouver, British Columbia.

16  

17                            Jonathan Tweedale

18  

19  

20  

21  

22  

23  

24  

25  

26  

DECLARATION OF JONATHAN TWEEDALE
IN SUPPORT OF THE KPMG DEFENDANTS'
RENEWED MOTION TO DISMISS
NO. 2:07-cv-00177-BHS – Page 4
474.01 ia091501 1/9/08

YARMUTH WILSDON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

*Indexed as:*
# Meier v. Canada (Minister of Justice)

**Between**
**John Herbert Meier, Plaintiff, and**
**The Minister of Justice and Attorney-General of Canada,**
**Defendants**

[1983] F.C.J. No. 425

Action No. T-860-83

Federal Court of Canada - Trial Division
Vancouver, British Columbia

**Cattanach J.**

Heard: May 9 and 10, 1983
Judgment: May 26, 1983

(12 pp.)

Gordon H. Dowding, for the Plaintiff.
M.J. Wruck, for the Defendants.

---

**CATTANACH J.**:-- Pursuant to the application by the defendants herein dated April 20, 1983, it has been ordered that the statement of claim of the plaintiff be struck out and the action be dismissed with costs to the defendants if demanded and that written reasons would be forthcoming. These are those reasons.

This is the motion made on behalf of the defendants pursuant to Rule 419 of the Federal Court Rules for an order striking out the statement of claim against the defendants named in the style of cause and dismissing the action therein alleged against them.

The foregoing application is based upon three grounds:

1. that there is no jurisdiction in this Court to entertain the action;
2. that there is no reasonable course of action disclosed in the statement of claim; and
3. that, in any event, the action is premature.

On February 5, 1981 a grand jury in the Supreme Court of California returned a verdict whereby the plaintiff herein, together with two others, were accused and indicted for the crime of murder.

Exhibit A, Page 5

On June 30, 1981 the Government of the United States requested of the Government of Canada the extradition of the plaintiff pursuant to the Treaty of Extradition between those countries entered into force on March 22, 1976. The offence of murder with which the plaintiff is charged in the State of California is covered by Article X of the Webster-Ashburn Treaty of 1842.

An Information under the Extradition Act (R.S.C. 1970 Chap. 3.- 21) was sworn before Mr Justice Taylor of the Supreme Court of British Columbia who issued a warrant of apprehension pursuant to section 10 of that Act.

A hearing under section 13 of the Act was held before Mr. Justice Toy of the Supreme Court of British Columbia. That hearing is to be conducted "as nearly as may be, as if the fugitive was brought before a justice of the peace, charged with an indictable offence committed in Canada". This I assume to be analogous to a preliminary hearing although I appreciate that the jurisprudence is that there are other factors upon which extradition may be denied.

On March 1, 1982, Mr Justice Toy issued a Warrant of Committal pursuant to paragraph 18(1)(b) of the Extradition Act.

By virtue of that paragraph a fugitive is committed to prison until surrendered to the foreign state if the evidence produced would justify a committal for trial if the alleged crime had been committed in Canada. This language, too, is compatible with the proceeding being analogous to a preliminary hearing.

Mr Justice Toy, to have issued a Warrant of Committal, must have found that sufficient evidence had been adduced to warrant the committal of the plaintiff to trial.

On March 1, 1982 the plaintiff sought a review of the decision of Toy, J., in the Federal Court - Appeal Division, pursuant to section 28 of the Federal Court Act which, on October 6, 1982, the Court of Appeal dismissed on the ground that Toy, J., was not acting as a "persona designata" and accordingly his decision was not a decision of a "federal board, commission or other tribunal," subject to review by the Court of Appeal.

On October 28, 1982, the Court of Appeal declined to grant leave to appeal this refusal to entertain the review to the Supreme Court of Canada.

On February 3, 1983 the Supreme Court of Canada likewise refused leave to appeal.

On March 1, 1982 the plaintiff filed a petition for habeas corpus and bail in the Supreme Court of British Columbia. This was withdrawn, perhaps because it was coincident with the application to the Federal Court under section 28 of the Federal Court Act.

On August 19, 1982, Callaghan, J., of the Supreme Court of British Columbia, granted bail to the plaintiff, which has been extended from time to time.

An application for habeas corpus with certiorari in aid dated April 15, 1983, made by the plaintiff and heard by Mr. Justice Esson of the Supreme Court of British Columbia who delivered judgment on April 27, 1983, refusing the petition for habeas corpus.

This decision has been appealed to the Court of Appeal of British Columbia but has not as yet been heard.

By virtue of section 19 of the Extradition Act, where a judge commits a fugitive to prison, as Toy,

J. did, he is charged to inform the fugitive that he will not be surrendered until the lapse of 15 days and that he has the right to apply for habeas corpus.

The judge is also obligated to transmit to the Minister of Justice a certificate of committal and a transcript of the evidence taken before him. He may also make such report on the case as he thinks fit.

It is alleged in paragraph 5(a) of the Statement of Claim that Mr Justice Toy made a report, received by the Minister on December 1, 1982, to the effect that he had erred in law in committing the plaintiff as he did "on the matter of the evidence of double criminality required under the Act and the Treaty aforesaid", i.e. the Webster-Ashburn Treaty of 1842 referred to in paragraph 6 of the Statement of Claim.

It is alleged in paragraph 5(b) of the Statement of Claim that the proceedings conducted by Toy, J., as a "persona designata" were so conducted without jurisdiction by reason of a change in the law wrought by the decision of the Supreme Court of Canada in Ministry of Indian Affairs v. Ranville (44 N.R. 616).

By that decision the concept of "persona designata" has been jettisoned and the extradition judge is acting as a Supreme Court judge.

Mr. Justice Esson in his decision delivered on April 27, 1983 dealt extensively with the above matter raised in the present Statement of Claim.

· He concluded the Ranville decision removed any doubt as to which review or appeal route should be followed and that in an extradition case the proper review route was that always extant, that is by way of habeas corpus.

The "persona designata" conception was scrapped without distortion of the prevailing legal principles.

Esson, J. accordingly concluded that Toy, J., conducted the hearing as he was authorized by the statute to do.

In the report Mr. Justice Toy made to the Minister pleaded in paragraph 5(a) of the statement of claim the view was expressed by him that if obiter in Bolduc v. A.C. Que. (1982) 68 C.C.C. (2d) 413, accurately reflects the law of Canada, his conclusions were incorrect.

After an exhaustive review of the authorities, Mr. Justice Esson said:

> I see nothing in the judgment in Bolduc v. A.G. Quebec which would indicate that the law of Canada is not as stated by Mr. Justice Toy in his reasons. It follows that I find nothing in the evidence which would lead to the conclusion that his decision, and the warrant were not lawful.

While I am in complete agreement with the reasoning and the conclusions reached by Mr Justice Esson, and even if I did not agree, I consider myself bound thereby, not by any principles of res judicata (which the matter is not, since the parties differ) nor upon stare decisis but upon comity between judges of coordinate jurisdictions. That the decision of Esson, J. is under appeal does not detract from that comity. His decision remains the law until he is shown to have been in error by a court of higher jurisdiction.

Sections 21 and 22 of the Extradition Act read:

21. No fugitive is liable to surrender under this Part if it appears

(a) that the offence in respect of which proceedings are taken under this Act is one of a political character, or

(b) that such proceedings are being taken with a view to prosecute or punish him for an offence of a political character.

22. Where the Minister of Justice at any time determines

(a) that the offence in respect of which proceedings are being taken under this Part is one of a political character,

(b) that the proceedings are, in fact, being taken with a view to try to punish the fugitive for an offence of a political character, or

(c) that the foreign state does not intend to make a requisition for surrender,

he may refuse to make an order for surrender, and may, by order under his hand and seal, cancel any order made by him, or any warrant issued by a judge under this Part, and order the fugitive to be discharged out of custody on any committal made under this Part; and the fugitive shall be discharged accordingly.

Section 21 states the law and repeats what it is and has been for many decades.

By virtue of the forms included in Schedule II of the Act and constituting part thereof, surrender of a fugitive is accomplished by the execution of an order for surrender by the Minister of Justice (Form Three).

By virtue of section 22, the Minister of Justice is vested with an absolute discretion to conclude whether or not an offence in respect of which proceedings are taken against a fugitive is one of a political character.

If he determines that the offence is of a political nature, he refuses to make an order for surrender and the consequences outlined in the section follow. If he determines otherwise, he makes the order for surrender.

The duty and function of the extradition judge under section 15 of the Extradition Act is to receive evidence tendered under the section including that directed to the political nature of the offence but not to adjudicate upon that particular evidence.

Under paragraph 18(b), if the extradition judge is satisfied that the evidence adduced before him with respect to the extradition crime alleged, (in this instance murder), is sufficient to justify the committal of the fugitive for trial in Canada, if committed here, then he shall issue the warrant of committal (Form Two to the Act).

The judge has no jurisdiction to order the surrender of the fugitive to the foreign state. This is determined by the Minister of Justice.

The judge acts judicially in extradition matters and, in addition, is enjoined to do so by section 9 of the Act. He does not act politically. To act politically is the function of the Minister of Justice.

This division of jurisdiction between the Judge and the Minister is set forth with clarity by Thurlow, J., (as he then was) in Armstrong v. State of Wisconsin (1973) F.C. 437, when he said at pages

452 and 453:

> It will be observed that while the extradition Judge is required by s. 15 to receive evidence tendered to show the political character of the offence, etc., nowhere in these provisions is he empowered to decide that question. Moreover, having regard to the definition in s. 2 and to the extradition arrangement between Canada and the United States the expression "extradition crime" in these sections must be treated in this case as meaning "any crime described in such arrangement" and when ss. 13, 14, 15, 18 and 19 are read with this definition in mind it does not appear to me that the extradition Judge is authorized to decide that the offence is of a political character or that it is for that reason not an extradition crime or to discharge the fugitive for such a reason.

He concludes on page 458:

> On the whole for the reasons I have given I am of the opinion that in Canada an extradition Judge is not empowered by the Act to determine the question or to discharge a fugitive on the ground of the offence being of a political character and it appears to me to follow from this that having been satisfied that the evidence with respect to the offences was sufficient to justify committal for trial as set out in s. 18 (1)(b) there can be no error in law in the learned Judge having issued his warrant, regardless of his conclusions as to what the evidence showed with respect to the political character of the offences.

In my view there is no incompatibility between the provisions of the Webster-Ashburton Treaty of 1842. Article X sets forth the agreement between the two contracting states and is the forerunner of section 21 of the present Act providing for not surrendering fugitives for political offence.

There was introduced into the Treaty in 1889 the treaty provisions of Article II and Article III.

The purport thereof is likewise included in sections 21 and 22 of the Extradition Act.

Article II provides that if any question should arise as to whether an offence is of a political character "the decision of the authorities of the government in whose jurisdiction the fugitive shall be at the time shall be final".

The words "the authorities of the government" clearly mean the Executive authorities and certainly not the judiciary.

The substance of the allegations in the statement of claim, as I see it, is that following upon the report of Mr. Justice Toy to the Minister, the Minister has not as yet decided not to grant an order for the surrender of the plaintiff and to rescind the committal order.

Mr Justice Esson has decided that the committal order by Toy, J., was lawful.

For the reasons expressed the determination as to whether the offence with which the plaintiff is charged is one of a political character is vested within the exclusive purview of the Minister of Justice.

What the plaintiff seeks in his statement of claim is declaratory relief against the Minister of Justice. It is the Minister of Justice who is obligated to make the determination under the Extradition Act.

By virtue of section 18 of the Federal Court Act the Trial Division has exclusive original jurisdiction under paragraph (a) thereof, amongst other things, "to grant declaratory relief against any federal board, commission or other tribunal."

In my view, the Minister of Justice is not a "federal board, commission or other tribunal". He is, at the most, an officer of the Crown vested with a discretion in this particular matter.

Thus under section 18 there is no jurisdiction vested in this Court to grant the declaratory relief sought against the Minister.

The plaintiff, however, invokes paragraph 17(4)(b) of the Federal Court Act which provides that the Trial Division has concurrent original jurisdiction

> ...in proceedings in which relief is sought against any person for anything done or omitted to be done in the performance of his duties as an officer or servant of the Crown.

In this instance the substance of the relief sought, as I understand that it might be, would be to declare that the Minister is obligated to do what he has not as yet done, that is determine whether or not the offence in respect of which extradition proceedings are being taken is one of a political character. That is nothing more than a restatement of the law as it is in the Statute.

Quite frankly, since the question as to whether the committal order was properly given is sub judice, it is, in my view, both inappropriate and improper for the Minister to make his determination. If it should be determined on appeal that the plaintiff has not been charged with an extradition offence or that sufficient evidence was not adduced before the extradition judge to warrant the plaintiff's committal for trial if the offence had been committed in Canada, then the committal order would be quashed.

In that event the plaintiff would not be extradited and the Minister would not be called upon to exercise his discretion.

Different considerations would apply if the extradition order made by the Court of the first instance is found to have been lawfully made upon appeal. Only in that instance would the Minister be called upon to exercise the discretion of the executive to refuse to extradite for political crimes as determined by him. The Minister might accept the extradition order made by the Court or he can refuse to follow that order if the treaty and the legislation provides for such a discretion as is the case in the present instance.

Therefore, for the Minister to exercise the discretion vested in him before the ultimate disposition of the matter in the Court is premature and until the Minister has had that opportunity to do so subject to that qualification I think to be reasonable the statement of claim is likewise premature.

Further and more compelling is that there is no jurisdiction in this Court to grant the relief sought by the plaintiff. The only declaratory relief which I can envision being properly given would be a declaration which would be merely repetitive of the law as it is, namely that the Minister may determine that the offence in respect of which extradition proceedings are taken is of a political nature which has been previously mentioned.

It is not within the province of the Court to purport to say how that determination should be made.

The Minister may say that this is not such a case in which extradition ought to be granted.

I should think that at any time before the plaintiff is surrendered to the requesting government, the proper forum to which representations may be made if reasons exist why his surrender should not be granted is the Minister. These are matters of political complexion. They are not matters which enter into the duty of the judiciary to determine.

Neither is it the function of the Court to conjecture that the Minister will not fulfil his function when it is apposite to do so.

It is now appropriate to consider the declaratory relief sought in the prayer therefor.

Paragraph (a) requests:

> A declaratory judgment that the defendant is disqualified from proceeding under the Extradition Act against the plaintiff.

This is predicated upon bias in that an officer of the Department of Justice assumed the conduct of the extradition proceedings on behalf of the State of California and the Minister of that Department determines if the offence is one of a political character.

This has been resolved by Jerome, A.C.J. in Re Sudar and the United States of America (62 C.C.C. (2d) 173) in which he concluded that he was not convinced that "the Minister will ultimately be placed in a position of conflict of interest".

Even assuming that bias in the legal sense may exist, then it is countenanced by the Statute.

Paragraph (b) reads:

> A declaratory judgment that from the report of the extradition judge no evidence of double criminality exists upon which surrender may be authorized by law;

This is a matter to be resolved upon appeal by way of habeas corpus which has been done. It is not the subject of review under section 28 of the Federal Court Act and habeas corpus is not within the jurisdiction of the Trial Division.

Paragraph (c) reads:

> A declaratory judgment that the plaintiff is a person not subject to surrender to the requesting state as being a person described in section 21 of the Extradition Act.

This is precisely the question for determination by the Minister and not the judiciary.

Paragraph (d) reads:

> A declaratory judgment that the requesting country, the United States of America, is barred by its constitution and the facts from seeking extradition of a person neither found within the said country or fled therefrom at any time material hereto.

This is a question for best determination before the courts of the United States.

Paragraph (e) reads:

> A declaratory judgment that the certificate of the extradition judge required under the relevant extradition arrangement has not been provided to the defendant upon which he would be entitled to proceed to a decision in the plaintiff's case.

There is no allegation of fact in the statement of claim upon which this relief could be founded.

Paragraph (f) reads:

> An injunction ordering the defendant to halt all proceedings against the plaintiff for the extradition on the request made by the United States herein.

This matter has also been resolved by Jerome, A.C.J. in the Sudar case (supra). He said at page 175 that the officers of the Department of Justice are acting in conformity with what the Minister of Justice concedes to be his obligation under the treaties and supporting statutes equally therefore, I am unable to find any support for an order of this Court which might restrain, in some way, the Minister's officials from participating in those proceedings.

For the reasons expressed, there is no jurisdiction in this Court to entertain the statement of claim, neither is the statement of claim based upon any existing federal law within the principles enumerated in Quebec North Shore Paper Company o Canadian Pacific Limited ((1977) 2 S.C.R. 1054) and McNamara Construction (Western) Limited to The Queen ( (1977 2 S.C.R. 654) creating a cause of action in the plaintiff.

Added to this the statement of claim was premature in any event.

Accordingly, the statement of claim is struck out and the action is dismissed. The defendants shall be entitled to their costs if demanded.

CATTANACH J.

*Case Name:*
# Harrison v. Harrison

**Between**
**Dianne Mary Harrison, Respondent (Plaintiff), and**
**Arthur Lewis Harrison, Appellant (Defendant)**

[2007] B.C.J. No. 350

2007 BCCA 120

Vancouver Registry No. CA33330

British Columbia Court of Appeal
Vancouver, British Columbia

**Finch C.J.B.C., Donald and Chiasson JJ.A.**

Heard: January 8, 2007.
Judgment: February 26, 2007.

(54 paras.)

*Family law -- Divorce -- Grounds -- Separation -- Reconciliation -- Appeal by husband's Estate from order vacating an earlier unentered order declaring that the spouses had no hope of reconciliation allowed, and order set aside -- Nothing in judge's reasons to show that he took parties' conflicting interests into account before setting aside the order -- Judge considered only the wife's interests with respect to the severed joint tenancy, to the exclusion of the interests of the husband's children.*

*Civil procedure -- Judgments and orders -- Amendment, rescission and variation -- Consent orders -- Slip rule, correction of errors or omissions -- Appeal by husband's Estate from order vacating an earlier unentered order declaring that the spouses had no hope of reconciliation allowed, and order set aside -- Nothing in judge's reasons to show that he took parties' conflicting interests into account before setting aside the order -- Judge considered only the wife's interests with respect to the severed joint tenancy, to the exclusion of the interests of the husband's children.*

Appeal by the Estate of the husband from an order vacating an earlier unentered order declaring that the spouses had no hope of reconciliation. The order was made under s. 57 of the Family Relation Act without consent at a judicial case conference. The wife disagreed to the making of the order based on questions as to the date at which the matrimonial home was to be valued. On the last day of the appeal period from the order, the husband died unexpectedly. In the interim, the wife had taken no steps indicating an intention to appeal from the order. At issue was whether the case management order was a valid order, whether the judge had discretion to vacate the order, and if so, whether he exercised his discretion judicially.

HELD: Appeal allowed and second order set aside. The original order remained in effect. There was no

mutual consent to a s. 57 declaration being made at the case conference, and the case conference judge erred when he said that he did not need consent to make the order. However, it did not follow that the s. 57 declaration was not a valid order. Although irregular, the order was not a nullity. It was valid when made, and remained so unless or until it was reversed on appeal or otherwise set aside. There was no equivalent to an entered order. It followed that the case conference judge was not functus officio and he had a broader discretion to re-consider the order than if the order had been entered. The husband's death after the s. 57 declaration was made was an important new circumstance that might have reasonably caused the judge to reconsider the way he exercised his discretion. It was open to the judge to hear the wife's application and to set aside the earlier order. However, there was nothing in the chambers judge's reasons to show that he took the parties' conflicting interests into account before setting aside the s. 57 declaration. In particular, there was nothing to show that he considered the needs of the children and the fact that vacating the earlier order would deprive them of any opportunity to benefit from their father's interest in the family assets affected by the s. 57 declaration. The judge considered only the wife's interests with respect to the severed joint tenancy, to the exclusion of the interests of the husband's children.

### Statutes, Regulations and Rules Cited:

British Columbia Supreme Court Rules, Rule 2(1), Rule 41(10), Rule 41(24), Rule 60E, Rule 60E(12), Rule 60E(12)(b)

Family Relations Act, s. 57

### Counsel:

J.G. Dubas: Counsel for the Appellant

J.M. Dreyer: Counsel for the Respondent

---

The judgment of the Court was delivered by

**FINCH C.J.B.C.:--**

### I. INTRODUCTION AND ISSUES

1    On 13 October 2004, at a family law Judicial Case Conference, the Case Conference Judge made a "section 57 order", without consent, under the provisions of the *Family Relations Act*. Although not expressed in terms by the judge when making the order, s. 57 gives the Court a discretion to declare "... that the spouses have no reasonable prospect of reconciliation with each other." A s. 57 declaration is a "triggering event" for the purposes of determining and dividing family assets under the legislation.

2    No formal order containing the s. 57 declaration was entered. Rather, a notation was made on the last page of the "Case Management Plan":

    PART V. OTHER ORDERS/DIRECTIONS GIVEN AT JCC

    ORDERS: Section 57

3    The Case Management Plan was signed by the judge and by both counsel. The original of the Case

Exhibit B, Page 14

Management Plan was stamped and filed in the Court Registry at New Westminster where the case conference was held.

**4**    On 12 November 2004, the last day of the appeal period from the order of 13 October, Mr. Harrison died unexpectedly. In the interim Mrs. Harrison had taken no steps indicating an intention to appeal from the order.

**5**    On 8 February 2005 counsel for Mrs. Harrison filed an application under Rule 41(24) (the "Slip Rule") and pursuant to the inherent jurisdiction of the Supreme Court to vacate the s. 57 order. On 18 August 2005 the Slip Rule application was heard by the Case Management judge who had made the s. 57 declaration. He "vacated" the earlier order. In his reasons for doing so he said:

> [2] When I made the order, however, I did not consider the effect of making that order was to sever the joint tenancy. In the interests of justice, therefore, I am satisfied that this is a case where the order that was made by me should be vacated. This is without prejudice to any further action that may be taken by either side in this matter.

**6**    The estate of Mr. Harrison, now represented by his former common law wife, Patricia Wilton, appeals from the order of 18 August. Ms. Wilton was appointed Mr. Harrison's legal representative by court order on 5 August 2005. She is the mother of three children, of whom Mr. Harrison was the father.

**7**    The issues arising on this appeal therefore appear to be:

> 1. Whether the order of 13 October 2004, having been made without consent, was a "valid order";

> 2. If the order was valid, did the judge have a discretion pursuant to Rule 41 (24), or otherwise, to vacate the s. 57 order; and

> 3. If the judge had a discretion to vacate the s. 57 order, was the discretion exercised judicially?

## II. FACTS

**8**    Acting on her own behalf, Mrs. Harrison issued a Writ and Statement of Claim on 26 October 2001. She asserted in paragraph 20 of the Statement of Claim that "there is no possibility of reconciliation." She claimed, *inter alia*, spousal support, a determination of family assets, an order for partition and sale of all assets, and payment of "not less than 50% of the net proceeds."

**9**    Mr. Harrison retained a solicitor. In the Defence and Counterclaim filed on his behalf he sought a declaration under s. 57 of the *Family Relations Act* that "there is no possibility of reconciliation" between the parties.

**10**    At the Judicial Case Conference on 13 October 2004 [the "JCC"] both parties appeared by counsel. A transcript of the proceedings, which were held in camera, has been filed. It appears that the main topics of discussion were the division of family assets, and in particular the matrimonial home, and disclosure of documents.

**11**    Mr. Dubas, counsel for Mr. Harrison, asked the Court to make a declaration that there was no prospect of reconciliation under s. 57 of the *Family Relations Act*. Ms. Dreyer, counsel for Mrs. Harrison, opposed the making of such an order. The respondent's disagreement to the making of such an

Exhibit B, Page 15

order seemed to focus on the question of the date at which the matrimonial home should be valued.

**12**    The following exchange occurred:

[MR. DUBAS]        Where I think this thing needs to go is I think there needs to be disclosure. I've asked my friend for three orders today, two of which I believe are going by consent, one being ---

THE COURT:        And what are they?

MR. DUBAS:        -- one being a declaration of no prospect of reconciliation --

THE COURT:        That's s. 57 and s. 67?

MR. DUBAS:        Fifty-seven.

THE COURT:        And 67?

MR. DUBAS:        And my friend's nodding, no, she's not --

MS. DREYER:        No, we're not agreeable. I've got an outstanding settlement proposal and these issues are very narrow and the values of these properties are very notional and my client wants there to be some serious consideration as to what she's proposed or not. She's inclined to not muddy the issue with yet a further triggering event date, in the event this matter goes to full hearing -- ...

. . .

MS. DREYER:    My client's entitled to make her arguments at trial for reapportionment and show the contributions she made prior to the marriage and subsequent to the ending of the marriage, and the court shouldn't be confused with valuation dates. She's prejudiced significantly by the fact that <u>she</u> --

MR. DUBAS:    Well --

MS. DREYER:    -- <u>represented herself for a large part of these proceedings and didn't pursue the s. 57 declaration in the first year of separation,</u> but albeit she didn't know where Mr. Harrison was.

MR. DUBAS:    <u>On that issue,</u> and I - <u>the court can't make an order today,</u> but the court might - quite frankly, I know of no case - the only issue is whether the parties are going to reconcile. My client's now had a child with another woman, he's living in another relationship. There is no doubt that, as soon as we bring the application, there will be a s. 57 declaration. I think all we're doing, quite frankly, is wasting money for the parties if it's not agreed to today.

THE COURT:    Is there a no reconciliation order?

MR. DUBAS:    Yes.

THE COURT:    That's - well, <u>I don't see any problem making that order, the section</u> - that's s. 67, is it?

MR. DUBAS:    <u>Section 57.</u>

THE COURT:    <u>Fifty-seven, all right. I will make the s. 57 order. I do not need</u>

consent for that. ...

[Emphasis added.]

**13**   The s. 57 declaration was subsequently noted on the Case Management Plan, the plan was signed by the judge and by both counsel, and the original of the plan was stamped and filed in the Court Registry.

**14**   There matters rested until Mr. Harrison suddenly passed away on 12 November 2004 as the result of a blood clot. As mentioned above, no Notice of Appeal was filed within the period for appeal following the s. 57 declaration, and Mrs. Harrison took no other steps indicating an intention to appeal on her part.

**15**   From the material filed on the application for Ms. Wilton's appointment as legal representative for the estate of Mr. Harrison, it appears that she and Mr. Harrison had three children together, born 7 April 2001, 15 December 2002 and one in the spring of 2005, after Mr. Harrison had passed away.

**16**   It also appears from affidavit material that the Harrison matrimonial home was the parties' main family asset, that it had, according to one appraisal, a market value of $160,000 as at 1 April 2001, that there was a mortgage against the property of approximately $150,000, that the mortgage was "life insured", and that the mortgage was subsequently discharged upon the death of Mr. Harrison.

### III. DISCUSSION

**1.**      **Was the order of 13 October 2004 valid?**

**17**   Family Law Judicial Case Conferences are governed by Supreme Court Rule 60E. It provides in part:

> (12)   At a judicial case conference, the judge or master may
>
> > (a)   make any of the following orders, whether or not on the application of a party:
> >
> > > (i)      the pleadings be amended or closed within a fixed time;
> > > (ii)     a party deliver a list of documents or a statement in Form 89 within a fixed time;
> > > (iii)    interlocutory applications be brought within a fixed time;
> > > (iv)     examination for discovery be conducted within a schedule that the court directs;
> > > (v)      setting limitations on discovery procedures;
> > > (vi)     experts' report be exchanged within a schedule that the court directs;
> > > (vii)    the parties attend a mini-trial or settlement conference;
> > > (viii)   the proceeding be set for trial on a particular date or on a particular

trial list, subject to the approval of the Chief Justice, and

(b)    make any other order with the consent of the parties.

**18**    It is common ground that a declaration under s. 57 is not encompassed by any of subrules 12(a)(i)
(viii). The order ought, therefore, only to have been made, if at all, by consent under subrule 12(b).

**19**    Counsel for Mr. Harrison argues that the consent of Mrs. Harrison may be inferred from her
pleadings that there was no prospect of reconciliation. He says both parties agreed that a divorce order
should ultimately be made, and that Mrs. Harrison had moreover sought partition of assets and sale of
the matrimonial home. He also argues that because counsel for Mrs. Harrison signed the Case
Management Plan indicating that a s. 57 declaration had been made, and had taken no steps to set that
order aside, within the appeal period, it should be inferred that Mrs. Harrison consented to the order by
"acquiescence."

**20**    I am, with respect, not persuaded by any of these arguments. A statement made in support of
divorce pleadings that there is no possibility of reconciliation is no indication of consent for the making
of a s. 57 order at a Judicial Case Conference. There is nothing on the Case Management Plan signed by
counsel to suggest that the declaration was made by consent. The facts that a divorce order was sought
by both parties, that assets would ultimately be divided, or that the order was not appealed, are similarly
to my mind quite insufficient to show that the consent of Mrs. Harrison might be inferred from the
circumstances.

**21**    In any event, none of these circumstances can outweigh the clear position taken by counsel for
Mrs. Harrison at the JCC that she opposed the making of a s. 57 declaration. Counsel for Mr. Harrison
acknowledged that, in the absence of consent, " ... the Court can't make an order today."

**22**    I am therefore of the view that there was no mutual consent to a s. 57 declaration being made at the
Judicial Case Conference, and that the case conference judge erred when he said that he did "not need
consent" to make the order. It is clear that in the absence of consent, the s. 57 declaration was an order
not contemplated by Rule 60E(12), and ought not to have been made at the Judicial Case Conference.

**23**    It does not, however, follow that the s. 57 declaration made on 13 October 2004 was not a valid
order. Rule 2(1) of the Supreme Court Rules provides:

2(1) Unless the court otherwise orders, a failure to comply with these rules shall be
treated as an irregularity and does not nullify a proceeding, a step taken or any
document or order made in the proceeding.

**24**    In *Canada Transport v. Alsbury*, [1953] 1 D.L.R. 385 (B.C.C.A.), Mr. Justice Bird described the
general effect of an order made by a Superior Court judge:

The order under review is that of a superior court of record, and is binding and
conclusive on all the world until it is set aside or varied on appeal. No such order may
be treated as a nullity.

**25**    Mr. Justice Sidney Smith said:

... the order of a superior court is never a nullity; but, however wrong or irregular, still
binds, cannot be questioned collaterally, and has full force until reversed on appeal.
(Authorities omitted.)

Exhibit B, Page 19

**26**    In ***Wilson v. The Queen***, [1983] 2 S.C.R. 594 the majority of the Supreme Court of Canada approved of this statement made by Mr. Justice Monnin (as he then was):

> The record of a superior court is to be treated as absolute verity so long as it stands unreversed.

**27**    In my view therefore, the making of a s. 57 declaration at a Judicial Case Conference without the consent of both parties did not comply with Rule 60E. Although irregular, the order was not a nullity. It was valid when made, and remained so unless or until it was reversed on appeal, or otherwise set aside.

**2.**        **Did the judge have a discretionary power pursuant to Rule 41(24) or otherwise to vacate the s. 57 order?**

**28**    The scope of a trial judge's discretion to vary an order after pronouncement depends on whether a formal order has been entered. So long as the order remains unentered, the judge retains "an unfettered discretion" to re-open the matter. That discretion should be used sparingly: ***Sykes v. Sykes*** (1995), 6 B.C.L.R. (3d) 296 (C.A.). Although this discretion is sometimes treated as part of the discretion granted by Rule 41(24), the "Slip Rule", it is in fact a common law discretion recognized by this Court in ***Clayton v. British American Securities Ltd.***, [1934] 3 W.W.R. 257, [1935] 1 D.L.R. 432.

**29**    Once an order has been entered, however, the court which made the order is *functus officio* with respect to the issues therein: ***Piyaratana Unnanse et al v. Wahareke Sonuttara Unnanse et al***, [1950] 2 W.W.R. 796 (P.C.). Once the judge is *functus*, the power to re-visit an order is much narrower. Generally speaking, that power is confined to making corrections or amendments in two situations: first, under Rule 41(24) of the ***Supreme Court Rules*** where there has been a slip' in drawing up the order or where a matter should have been but was not adjudicated upon; and second, where there has been an error in expressing the manifest intention of the court: ***Buschau v. Rogers Communications Inc.***, 2004 BCCA 142; see also ***Chandler v. Alberta Association of Architects***, [1989] 2 S.C.R. 848.

**30**    Thus, the source and scope of the discretion in this case depends on whether the Case Conference judge was *functus officio* with respect to the s. 57 declaration. In most cases, this would be a simple question, determined by whether a formal order had been entered, or not. This is not such a case.

**31**    No formal order was ever drawn and entered prior to Mrs. Harrison's Slip Rule application. However, counsel for Mr. Harrison's estate argues that the endorsed Case Management Plan effectively takes the place of a formal entered order, and he takes the position that the judge was thereafter *functus officio*. Counsel points to Rule 41(10) and argues that the Case Management Plan, with the notation "ORDERS: Section 57", is an "other document" within the meaning of that Rule:

> 41(10) If an order has been made substantially in the same terms as requested, if the court endorses the notice of motion, petition or other document to show that the order has been made or made with any variations or additional terms shown in the endorsement, it is not necessary to draw up the order, but the endorsed document must be filed.

**32**    In this case there was no notice of motion or petition presented on the JCC, and counsel for Mrs. Harrison says it is therefore unclear what order was made. She says the Case Management Plan does not refer to the ***Family Relations Act***, and there is nothing to link the reference to s. 57 in the plan opposite

the word "ORDERS" to that enactment, to make it clear what was being ordered. Counsel for Mrs. Harrison maintains that the notation on the JCC Plan could never be enforced as an order of the Court, and that for example, the Land Title Office would never accept that plan as sufficient to show the transfer or vesting of an interest in land from one spouse to another. She says the notation on the plan is not "the Order" but rather a summary of the directions made at the Case Conference, in much the same way a clerk's notes are a summary of orders and directions made in chambers. She argues that the signature on the plan does not signify or imply counsel's consent to the making of the orders and she says the tapes or transcripts of a JCC are not available to parties, for the purpose of clarifying the orders made, unless the court so orders. So she says the notation on the Case Management Plan does not bring the document within the ambit of Rule 41(10).

**33**    There is no doubt the judge made a declaration under s. 57 of the *Family Relations Act*. It is clear from the context of the discussions during the case conference that "s. 57" could only be a reference to s. 57 of the *Family Relations Act*. Both counsel and the judge were fully aware of what legislation was under discussion, and the nature of the order Mr. Dubas sought. Section 57 contemplates the making of only one order, namely, "... a declaratory judgment that the spouses have no reasonable prospect of reconciliation." The entry of "Section 57" is made on the Case Management Plan on page 7 under "Part V":

> PART V. OTHER ORDERS/DIRECTIONS GIVEN AT JCC
>
> ORDERS: Section 57

**34**    Noted in that way, it is evident that a s. 57 order was "given" and not refused.

**35**    It is admitted by counsel that the judge's signature appears immediately below that notation, and that adjacent to the judge's signature are the initials or signatures of both counsel. It is also admitted that the original of the Case Management Plan was filed in the Court Registry at New Westminster, and stamped.

**36**    However, these facts establish only that the order was made, that the parties were certain as to its terms, and that the Case Management Plan was filed with the Court Registry. To determine whether this is sufficient to satisfy Rule 41(10), however, one must consider the purpose behind drawing and entering an order.

**37**    In *Conduct of Civil Litigation in British Columbia*, looseleaf (Markham: LexisNexis Canada, 2978), Fraser and Horn describe that purpose as threefold:

> (a)    the successful party may show his authority for proceeding under its terms;
> (b)    the unsuccessful party may have proper material upon which to base an appeal; and
> (c)    what is then *res judicata* between the parties is defined with some precision.

**38**    There is nothing before us to show that an endorsed Case Management Plan has ever been treated for any purpose as an "other document" within the meaning of Rule 41(10), or as the equivalent of a formal order signed and entered. Unlike a formal order, there is nothing on the face of the Case Management Plan to show the affidavit or other evidence on which the order was made, and hence the basis on which the judge exercised his discretionary power. In this case there is a transcript of what counsel said, but that is not part of the order.

**39**    In my opinion a Case Management Plan is not an "other document" similar to a notice of motion or a petition, which Rule 41(10) gives as examples of documents which when endorsed render a formal

order unnecessary. In *Conduct of Litigation in British Columbia, supra,* the authors suggest that a draft order might constitute an "other document". Notices of motion, petitions and draft orders have common features not shared by a Case Management Plan, such as a standard appearance based on Court Forms, and a recitation of the evidence heard or referred to when the order was made.

**40**    I agree with counsel for the respondent that the Plan is more like a summary of the orders and directions made at the JCC in much the same way that a clerk's notes are a summary of orders and directions made in chambers. The signatures of counsel are evidence that the Plan notation accurately represents those orders and directions, as the proceedings on a JCC are confidential and will not be transcribed without an order of the Court, pursuant to Supreme Court Practice Directive, 18 October 2002.

**41**    In my opinion Rule 41(10) does not apply and there was no equivalent to an entered order. It follows that the case conference judge was not *functus officio* and, he had a broader discretion to re-consider the order dated 13 October 2004 than if the order had been entered. The scope of that broader discretion was described in *Clayton v. British American Securities Ltd., (supra).*

### 3.        Was the reversal of the earlier order a proper exercise of discretion?

**42**    The primary consideration in whether to re-open a case, or set aside an earlier unentered order, is whether a miscarriage of justice would otherwise occur: see *Kemp v. Wittenberg,* [1999] B.C.J. No. 810 (S.C.); *Dudas (Guardian ad litem of) v. Munro,* [1993] B.C.J. No. 2035 (S.C.) and *Bell v. Bell,* 2001 BCCA 148.

**43**    Circumstances in which an earlier order will be revisited include fresh evidence not available when the earlier order was made, or a change in circumstances between the date of that order and the application to re-open: see *Foster v. Kockums Cancar Division Hawker Siddeley Canada Inc.* (1993), 83 B.C.L.R. (2d) 207 (C.A.); *Grigg v. Berg Estate,* [2000] B.C.J. No. 1080 (S.C.). Here, the death of Mr. Harrison after the s. 57 declaration was made was an important new circumstance that might reasonably cause the judge to reconsider the way he exercised his discretion. It was, in my opinion, open to him to hear Mrs. Harrison's application, and to set aside the earlier order, if that was necessary to avoid a miscarriage of justice. The discretionary power to set aside or vary an earlier order must of course be exercised judicially: *Federal Business Development Bank v. Mission Creek Farm Inc.* (1988), 25 B.C.L.R. (2d) 188 (C.A.); and *Galiano Conservancy Association v. British Columbia (Ministry of Transportation and Highways)* (1996), 17 B.C.L.R. (3d) 392 (S.C.).

**44**    The only statement in the chambers judge's oral reasons for judgment on 18 August 2005 to indicate the basis for his order is this:

> [2] When I made the order, however, I did not consider the effect of making that order was to sever the joint tenancy. In the interests of justice, therefore, I am satisfied that this is a case where the order that was made by me should be vacated. This is without prejudice to any further action that may be taken by either side in this matter.

**45**    It is evident that the judge did not have before him a transcript of the discussion at the Judicial Case Conference on 13 October 2004, and apparently did not have his mind directed to Mrs. Harrison's opposition to a s. 57 declaration, namely that it would be a "triggering event" with respect to family assets and their division. If the judge had had his attention drawn to that earlier discussion he could not,

Exhibit B, Page 22

I think, have made the statement that he "did not consider the effect of the order would be to sever the joint tenancy" in the matrimonial home.

**46**   What the judge did have before him on 18 August 2005 was evidence that Mr. Harrison died on 12 November 2004, and that prior to his death the matrimonial home was registered in the parties' names as joint tenants.

**47**   The judge also had before him Ms. Wilton's affidavit deposing to the fact that she and Mr. Harrison had three children, her personal circumstances and limited financial means, and the children's need for financial support from Mr. Harrison's estate.

**48**   There is nothing in the chambers judge's reasons to show that he took these conflicting interests into account, before setting aside the s. 57 declaration. In particular, there is nothing to show that he considered the needs of the children, and the fact that vacating the earlier order would deprive them of any opportunity to benefit from their father's interest in the family assets affected by the s. 57 declaration.

**49**   Remembering that the principal reason for setting aside an earlier order is to prevent a miscarriage of justice, the question is whether the order of 18 August 2005 can be said to have been a judicial exercise of the judge's discretion. I do not think it can. It appears to me that the judge considered only Mrs. Harrison's interests with respect to the severed joint tenancy, to the exclusion of the interests of Mr. Harrison's children with Ms. Wilton.

**50**   I can see no basis for saying that to leave the s. 57 order of 13 October 2004 in place would result in a miscarriage of justice. Indeed, the order setting it aside is more apt to lead to such a result in my view.

**51**   I would set aside the order of 18 August 2005.

**52**   I have considered whether in these circumstances the Court should remit the case to the B.C. Supreme Court for a reconsideration of Mrs. Harrison's application to set the order of 13 October 2004 aside. I do not think that would be in the interests of justice. These proceedings have already been far too long and expensive. The modest assets of the Harrisons' marriage cannot withstand much further depletion in the litigation process.

**53**   I would allow the appeal and set aside the order of 18 August 2005. The order of 13 October 2004 will remain in effect. If the parties remain unable to resolve their differences, any unfairness to Mrs. Harrison in the restoration of the s. 57 declaration might be addressed on an application to reapportion the family assets.

**54**   In the circumstances described, I would order that each party bear its own costs of the appeal.

FINCH C.J.B.C.
DONALD J.A.:-- I agree.
CHIASSON J.A.:-- I agree.

cp/e/qlemo

Exhibit B, Page 23